UNITED STATES of America, Plaintiff,

v.

Salvatore LOCASCIO, et al., Defendants.

No. 03 CR 304 CBA.

United States District Court, E.D. New York.

Sept. 28, 2004.

---

Eric P. Franz, Law Offices of Eric Franz, Maurice H. Sercarz, Sercarz & Riopelle, New York, NY, for Defendant.

Eric Ross Komitee, Jeffrey Alan Goldberg, Linda A. Lacewell, Thomas Alan Firestone, United States Attorney's Office, Brooklyn, NY, for Plaintiff.

## MEMORANDUM & ORDER

AMON, District Judge.

Presently before the Court are a series of severance motions made by defendants Norman Chanes, Richard Martino, Thomas Campos, Daniel Martino, Thomas Pugliese, Lawrence Nadell, Yitzhak Levy, and Kenneth Schaeffer[1], and a motion by the government to disqualify Weil, Gotshal & Manges LLP ("Weil Gotshal") as defense counsel for defendant Norman Chanes. For the following reasons (1) the severance motion made by defendants Nadell, Schaeffer, and Levy pursuant to Rule 14 of the Federal Rules of Criminal Procedure

is granted; (2) all other severance motions are denied; (3) and the government's motion to disqualify Weil Gotshal is granted.

### THE INDICTMENT

The central charges in this case are alleged violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, ("RICO"). The indictment alleges that seven of the eleven defendants are either members or associates of the "Gambino Family of La Cosa Nostra," the alleged RICO enterprise. These seven defendants[2] (the "RICO Defendants") are charged with racketeering and racketeering conspiracy (Counts One and Two) and with money laundering and money laundering conspiracy (Counts 15–20). In addition, defendants Richard Martino, Daniel Martino, and Norman Chanes are alleged to have participated in mail and wire fraud in connection with two separate schemes: the first, outlined in Counts 3–10, involved the inclusion of charges on consumers' telephone bills for services which they had not requested ("the telephone cramming scheme"); the second, set forth in Counts 11–14, pertained to a scheme in which visitors to adult entertainment websites run by certain defendants were allegedly misled into believing that they were receiving a free tour, while in reality charges were levied to their credit cards, which they had provided for age verification purposes ("the internet scheme"). Zef Mustafa, Andrew Campos, and Thomas Pugliese, the remaining RICO defendants, are also charged with the telephone cramming scheme.

1. USP & C initially joined in both a motion for severance on the grounds of improper joinder made by defendant Schaeffer, as well as in a motion for severance under Rule 14 made by defendants Schaeffer, Nadell, and Levy. However, in a letter to the Court dated September 14, 2004, USP & C asked to withdraw its motions for severance.

2. Salvatore LoCascio, Richard Martino, Zef Mustafa, Norman Chanes, Daniel Martino, Andrew Campos, and Thomas Pugliese.

Defendants Schaeffer, Levy, Nadell, and USP & C are the only defendants not charged with either RICO violations or money laundering. Levy and Nadell are charged with involvement in both the telephone cramming and internet schemes to defraud, whereas defendants Schaefer and USP & C are only charged with involvement in the telephone cramming scheme.

### I. The Racketeering Charges:

According to the indictment, the purpose of the Gambino Crime Family, the enterprise, was to "generate money for its members and associates through crime, including mail fraud, wire fraud, credit card fraud, money laundering and other crimes." (Ind. at ¶ 5.) The Family allegedly operates through groups of individuals referred to as "crews." Each crew is composed of "made" members of the Gambino Family referred to as "soldiers," and is headed by a "captain," or "capo." Captains received a share of the criminal proceeds obtained by their crews, in exchange for which they supervise the criminal activities and provide support and protection. Crewmembers are expected to pay "tribute" to their captains by providing them with a certain percentage of their illegal proceeds. (Ind. at ¶¶ 2–3, 5.) In this case, the indictment alleges that illegal proceeds which were obtained via the telephone cramming and internet schemes were laundered for the purpose of fulfilling the obligations of paying tribute to superiors in the family. (Ind. at ¶¶ 58–60.)

### II. The Telephone Cramming Scheme:

This "cramming scheme" involved the use of USP & C, a corporation allegedly controlled by defendants Richard Martino, Daniel Martino, and Norman Chanes, to include unwarranted charges on consumers' telephone bills for services which they had not requested. (Ind. at ¶ 21.) The government alleges that defendants created advertisements promising free samples of adult entertainment phone services (the "marketing materials"). When a customer called the numbers in the advertisements, he allegedly began receiving recurring monthly charges on his telephone bill for a voice mail service which he had not requested. (Ind. at ¶¶ 22–23.) The indictment alleges that defendants prepared a set of advertisements and audio programs (the "approval materials") which differed from those used for marketing in that they appeared to properly seek the customers' authorization to charge a recurring fee for the voice mail service, which the material described fully. (Ind. ¶ 25–26.) These "approval materials" were provided to the telephone companies that allowed the charges to be added to customers' bills, as well as to complaining customers and regulatory agencies, thereby preventing discovery of the fraud. (Ind. at ¶¶ 24–26.)

### III. The Internet Scheme:

The internet scheme charged in the indictment involved the creation of a joint venture between two companies, Crescent Publishing and Lexitrans. Crescent Publishing created adult entertainment materials, which were then placed on websites by Lexitrans, a web hosting company controlled by Richard Martino; together they operated the adult entertainment websites. (Ind. at ¶¶ 42–44.) As previously noted, the alleged fraud involved visitors to the website being offered free tours after entering their credit card numbers for the alleged purpose of age verification. The websites were allegedly designed in such a manner as to trigger charges on the visitors' credit cards without their knowledge. (Ind. at ¶¶ 47–51.)

### IV. Money Laundering Charges:

The final counts in the indictment allege that the RICO Defendants conspired to commit and actually did commit money

laundering. According to the government, the proceeds from the allegedly fraudulent schemes described above were channeled through a series of companies—both shell companies and companies owned by certain defendants—in violation of 18 U.S.C. § 1956. Ultimately, the government alleges, substantial portions of these proceeds were funneled to Creative Program Communications, Inc., a company of which defendants Locascio and Mustafa together owned 75%, "in fulfillment of Richard Martino's obligation as a member of organized crime to share illicit proceeds with persons above him in the Gambino family." (Ind. at ¶ 60.)

### THE SEVERANCE MOTIONS

Defendant Schaeffer seeks a severance on the grounds of improper joinder under Rule 8(b) of the Federal Rules of Criminal Procedure; all other motions are based on Rule 14 of the Rules.

### I. Defendant Schaefer's Motion to Sever due to Improper Joinder Under Rule 8(b)

 Rule 8(b) permits joinder of two or more defendants in the same indictment where "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."[3] Fed. R.Crim.P. 8(b). The standard for joinder under Rule 8(b), as articulated in *United States v. Attanasio*, requires that the acts in which the defendants participated be "unified by some substantial identity of facts or participants" or "arise out of a common plan or scheme." 870 F.2d 809, 815 (2d Cir.1989) (citations omitted). In his motion to sever due to improper joinder, defendant Schaefer argues that he has

only been charged with the telephone cramming scheme set forth in Counts 3–10 of the indictment, and that these charges are "completely distinct" from the internet fraud scheme. Because he is not charged in the RICO counts—which provide the link between the two schemes—and because the telephone and internet schemes do not arise out of a "common scheme or plan," as required, defendant Schaefer argues, they do not meet the requirements for proper joinder under Rule 8(b) and must therefore be severed. (Schaefer Mem. June 8, 2004 at 9–10.)

Although it is true that the internet and telephone cramming frauds involve different activities and, as such, are distinct, courts have on several occasions held that joinder under Rule 8(b) is proper where a defendant, although not charged in the RICO count itself, is charged in substantive offenses which also serve as predicate acts in the RICO count. *United States v. Cervone*, 907 F.2d 332 (2d Cir.1990); *United States v. Gotti*, 2004 WL 602689, *4, 2004 U.S. Dist. LEXIS 4950 at *12 (S.D.N.Y. Mar. 26, 2004) (citations omitted); *see also United States v. Gallo*, 668 F.Supp. 736, 748 (E.D.N.Y.1987) (holding that "[t]he three 'non-RICO' defendants ... are also properly joined, because the substantive counts with which they are charged are also predicate acts for other codefendants in the RICO conspiracy count.").

The principal Second Circuit case on this issue is *United States v. Cervone*, in which eighteen defendants were charged in a 102–count indictment with charges including RICO violations, RICO conspiracy, labor bribery, extortion, and other associated crimes. 907 F.2d 332. Anthony Perna,

---

**3.** While this motion concerns the impropriety of the joinder of the offenses and technically would fall under Rule 8(a), the Second Circuit has held that where the challenge to joinder of offenses is made by a defendant in a multiple-defendant case, the motion is made under Rule 8(b) as opposed to 8(a). *United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir.1988).

one of the defendants, was not charged in the RICO conspiracy, but rather with only one count of bribery and one count of making false statements to law enforcement. Moreover, not only was Perna not charged in the RICO conspiracy count or in any of the underlying racketeering acts, but he was the only defendant not charged jointly in any count in the indictment with a defendant named in the RICO count, and the only defendant charged in the two counts that named him. *Cervone*, 907 F.2d at 341. Nevertheless, the court upheld the joinder on the grounds that a co-defendant had been charged in the RICO conspiracy and named in a predicate act for receiving the bribe that Perna offered. The government maintained that the counts could easily have been combined into a single count and the court held that "... the counts do concern common defendants and a common scheme involving a single labor bribe, so that joinder of Perna, though perhaps of limited benefit in the way of judicial economy, did not run afoul of Rule 8(b)." *Id.* at 341. Similar logic was applied to uphold joinder in *United States v. Gotti*, also a case involving RICO charges and organized crime connections. 2004 WL 602689, 2004 U.S. Dist. LEXIS 4950 (S.D.N.Y. 2004). In that case, the court denied a motion for severance on the basis of improper joinder under 8(b) where the defendant was not charged with the RICO violations but was charged with murder and conspiracy to commit murder. The murder constituted one of the predicate acts in the RICO counts. *Gotti*, 2004 WL 602689, **3–5, 2004 U.S. Dist. LEXIS at *11–15.

These cases are directly applicable here. The connection between the telephone cramming scheme with which Schaefer is charged and the other charges in the indictment is significantly more palpable than in *Cervone*. In this case, Schaefer is charged—together with five of the RICO-defendants—with having participated in a fraudulent scheme, the proceeds of which were allegedly laundered and channeled to senior members of the criminal enterprise. He was also an employee of Mical Properties, Inc., a company owned by defendant Martino, and a co-worker of two other defendants in the case who were charged in both the telephone and the internet fraud, both of which were predicate acts of the RICO charges. Moreover, Schaeffer—like Gotti—although not charged with the RICO counts themselves, is charged with fraud in connection with the telephone cramming scheme, which is one of the RICO predicate acts. Therefore, applying the court's logic in *Gotti* and *Cervone*, the defendants in this case are permissibly joined. Defendant Schaeffer's motion to sever under Rule 8(b) is therefore denied.

## II. Defendants' Motion to Sever under Rule 14

Rule 14(a) states that, "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R.Crim.P. 14(a). The severance decision is committed to the sound discretion of the trial court. *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *Zafiro v. United States*, 506 U.S. 534, 538–39, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir.1991); *United States v. Maisonet*, 1998 WL 355414 at *2 (S.D.N.Y. July 1, 1998). Nevertheless, there is a strong presumption against splitting up an indictment on the grounds of both efficiency and fairness. *Richardson v. Marsh*, 481 U.S. 200, 210, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) ("noting the 'vital role' joint trials play in the criminal justice system"). The

Supreme Court held in *Zafiro v. United States* that

> [W]hen defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.... When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened.

506 U.S. at 539, 113 S.Ct. 933. The assessment of the risk of prejudice is a fact specific inquiry and depends on the circumstances of each case. *Id.* In *United States v. Gallo*, 668 F.Supp. 736, 749 (E.D.N.Y.1987), the court listed a number of factors which must be considered in determining whether the prejudice of a joint trial rises to the level of justifying a severance, in particular: "the number of defendants and the number of counts; the complexity of the indictment; the estimated length of the trial; disparities in the amount or type of proof offered against the defendants; disparities in the degrees of involvement by defendants in the overall scheme; possible conflict between various defense theories or trial strategies; and, especially, prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant." 668 F.Supp. at 749. While no one factor is dispositive, the ultimate question is whether the jury can keep the evidence relevant to each defendant separate and render a fair and impartial verdict as to each defendant. *Id.; United States v. Kahaner*, 203 F.Supp. 78, 82 (S.D.N.Y.1962).

In *United States v. Casamento*, the court addressed the problem of long and complex trials and provided some "benchmarks" for district courts to use in exercising their discretion to sever trials. The court held that in cases in which the time estimated for the prosecution to make its case exceeds four months, the judge should "oblige the prosecutor to present a reasoned basis to support a conclusion that a joint trial of all the defendants is more consistent with the fair administration of justice than some manageable division of the case to separate trials for groups of defendants." 887 F.2d 1141, 1152 (2d Cir. 1989). Moreover, the court held that, as to the number of defendants in such a trial, the judge should require the prosecutor to make an "especially compelling justification for a joint trial of more than ten defendants." *Id.* In this context, the court noted the benefits of severing cases where the number of defendants is great: the jurors are required to serve for less time; the number of trial disputes are reduced by having a smaller number of defense counsel in each trial; the trial would be more manageable for the trial judge; and the smaller number of defendants would make focusing on the defendants easier for the jurors. *Id.*

With these factors in mind, the Court now turns to the individual severance motions.

### A. Rule 14 Motion of Levy, Schaeffer, and Nadell

■ Defendants Levy, Schaeffer, and Nadell moved for severance under Rule 14.[4] Defendants allege that because they

---

4. Defendants LoCascio, Richard Martino, Mustafa, Pugliese, Chanes, and Campos joined this motion with respect to the time management arguments presented by Levy, Nadell, and Schaeffer in favor of severance.

are the only individual defendants charged neither with RICO nor money laundering, a joint trial would be highly prejudicial to their right to a fair trial and would prevent the jury from reaching a fair verdict. These defendants argue that the inflammatory nature of the organized crime evidence—which they argue would be inadmissible in a separate trial against them alone—coupled with the government's anticipated argument that the organized crime evidence is in itself proof of the commission of the substantive crimes charged against Nadell, Levy, and Schaeffer amounts to level of prejudice sufficient to justify severance.

In effect, the government in this case is seeking to introduce extensive evidence about the existence of the Gambino Crime Family and the manner in which it functions, as well as actual video surveillance tapes and recorded conversations of specific instances in which several RICO defendants interacted at the infamous Ravenite Social Club or with the notorious John Gotti. Moreover, the government has recently suggested that it will also seek to introduce certain violent acts relating to certain RICO defendants with alleged ties to the Gambino Family.

In *United States v. Bellomo*, 954 F.Supp. 630 (S.D.N.Y.1997), the court addressed a similar scenario and granted severance. The RICO enterprise in this case was the Genovese Crime Family, and a majority of the defendants were charged with the RICO violations; the defendants that moved for severance, however, had only been charged with the operation of a separate illegal business—not with RICO violations. The court granted the motion for severance, noting that:

Absent severance, these defendants would face a lengthy trial that would include evidence of a RICO enterprise in which none of them is charged with participating. This evidence might preju-

dice these defendants significantly because the trial would include a great deal of evidence about an organized crime enterprise and its operations which would not be presented at a separate trial and which is not alleged to have been part of their criminal activity. Thus, there is clear potential for spillover prejudice in this case. Nor, as the government's proposal clearly concedes, is there any reason to subject these defendants to a lengthy RICO trial, much of which will have nothing to do with them.

*Id.* at 650. Similarly, in *United States v. Maisonet*, which involved violations of the federal narcotics laws, motions were made by two defendants who were not charged with RICO counts to sever their trial from their RICO co-defendants. The court considered various factors and found that "[g]iven the nature and extent of evidence that the Government will likely introduce against [the] codefendants, the potential for prejudice ... arising from a joint trial ... is substantial." *Maisonet*, 1998 WL 355414 at *6. The court thus granted the motion. The prejudice in this case is at least as severe as in both *Bellomo* and *Maisonet*, and the language of *Bellomo* cited above is directly applicable to this case. The equities here weigh in favor of not subjecting these defendants to a trial with eight additional defendants in which much of the most prejudicial evidence does not pertain to them. This is true even if the government does not present evidence of murder or other violent activities; the mere association with a Mafia family is, in itself, highly prejudicial. Where the majority of defendants are alleged to have been either members of the Family or associated therewith, it would be very difficult for a jury to avoid carrying over these highly prejudicial allegations to those defendants who are neither charged with

RICO activities, nor alleged to be affiliated with the Mafia.

The government has argued that severance would not cure this prejudice to the defendants because the same evidence will be admissible in a separate trial against Nadell, Levy, and Schaeffer. (Govt. Letter. Aug. 16, 2004 at 1–2.) Specifically, the government claims that it would press to include evidence of defendant Richard Martino's organized crime membership because "it is probative of an individual's mental state that he associates himself with a business that he knows to require— and benefit from—the protection of organized crime." (*Id.* at 2.) The government anticipates presenting evidence that the Mical employees—including Levy, Nadell, and Schaeffer—had discussed the news coverage alleging that Martino was a soldier in the Gambino Crime Family. Although the Court is not yet prepared to rule on the question of what evidence will be admissible in such a trial, it is clear that any such evidence of Martino's alleged organized crime affiliations would not concern whether in fact Martino was a member of the Crime Family, but only whether the defendants believed him to be. The evidence as to organized crime, if admissible at all, would be extremely limited in scope and purpose and would not generate the level of prejudice that would result from a joint trial, in which extensive testimony, pictures, and video footage will depict Mafia meetings at the Ravenite Social Club with personalities such as John Gotti. Moreover, any prejudice which might result if some limited evidence of organized crime were admissible would be more easily controlled where both the charges alleged and the number of defendants are smaller. The jury's ability to keep track of the evidence as it corresponds to the various defendants would be significantly enhanced in a trial with three defendants and eleven counts, as opposed to eleven defendants and twenty counts.

In addition to the danger of spill-over prejudice, the guidelines set forth in *Casamento* are particularly applicable to this motion. As noted above, this case involves twenty counts and eleven defendants. The government has estimated that the presentation of its case will take approximately four months and to say that the charges— involving the structure of the Gambino Crime family, RICO counts, two different yet equally elaborate schemes to defraud consumers, and the channeling of funds through numerous companies in a complicated money laundering scheme—are complex, would be an understatement. A judge is not required to accept the government's estimate of the time required to present its case without question, but is free to make an independent assessment thereof. *Casamento*, 887 F.2d at 1152. It is very possible that the government's estimate of four months will be exceeded, in which case the *Casamento* benchmarks would be triggered. Under *Casamento*, given the length of the trial and the number of defendants (over ten), there would be grounds for severance. In effect, in a separate trial for the Levy, Schaeffer, and Nadell, the RICO and money laundering charges would drop out, reducing the number of issues and defendants that a jury would have to keep track of.

In light of the serious prejudice likely to result from a joint trial, the duration and complexity of the trial, and the large number of defendants and counsel which are involved, this Court grants the motions to sever made by defendants Levy, Nadell, and Schaeffer.

B. *Motions by Chanes and Daniel Martino to sever under Rule 14*

Motions have also been made by defendants Chanes and Daniel Martino, seeking dismissal of the RICO counts against them and severance under Rule 14 from mem-

bers or associates of the Gambino Family. These motions are denied. This Court has declined to dismiss the RICO charges against defendants Chanes and Richard Martino, and as such, finds that severance of the trials will not cure any prejudice resulting from the admissibility of evidence on the RICO charges or the RICO enterprise, as the evidence would be admissible against the defendants in any separate trial as well. The concerns justifying the severance of Levy, Schaeffer, and Nadell above do not apply to defendants Chanes and Daniel Martino and the motions to sever under Rule 14 are therefore denied. Moreover, any arguments on the basis of judicial management are now resolved, as the number of defendants in the RICO trial will be reduced to eight based on the severance of Nadell, Levy, and Schaeffer, and the length of the trial will be shortened as well.

### C. Chanes' Motion to Sever the Internet and Audiotext Fraud Counts

■ Defendant Chanes—joined by Richard Martino, Pugliese, Daniel Martino, Campos, Nadell, Levy, and Schaeffer—seeks a severance of the internet and audiotext fraud counts on the grounds that a joint trial would be inherently and unfairly prejudicial. Chanes also argues that the racketeering charges associated with the internet scheme should be severed from the racketeering charges associated with the audiotext scheme.

Given the presumption in favor of joint trials and the fact that these two fraudulent schemes are both predicate acts for the overarching RICO charges, this Court declines to exercise its discretion in favor of severance. Chanes cites only one case in support of his argument, and even that case is factually very different. In *United States v. Villanueava Madrid*, 302 F.Supp.2d 187 (S.D.N.Y.2003), the defendant was charged with conspiracy to launder the proceeds of illegal activity and

conspiring to commit bank and wire fraud entirely unrelated to the money laundering charges. In this case, however, the two alleged frauds are linked, not only in that they are similar, but because they are both predicate acts of the RICO charges in which Chanes—and the majority of the defendants who have joined his motion—are charged. Not only is severance not justified because of the inherent nature of the RICO charges, but the prejudice also does not outweigh the court's interest in judicial efficiency which would be undermined by severing these trials. Moreover, requiring the government to divide its evidence of the RICO counts and parse it between these two frauds is unjustified and would place an unnecessary burden on the government to divide up its case. The motion to sever the audiotext and internet fraud charges is therefore denied.

### DISQUALIFICATION OF COUNSEL FOR NORMAN CHANES

The government has moved to disqualify defendant Chanes' counsel, John Wing, and his firm, Weil, Gotshal & Manges LLP, principally because a partner in Mr. Wing's law firm will likely be a government witness in this case, and because Mr. Wing has previously represented another potential government witness.

### I. Background

In 1985, Norman Chanes and Monroe Caine were indicted for mail fraud in the Southern District of New York. Mr. Wing, a partner at Weil Gotshal, represented Caine in that case. Both Chanes and Caine pled guilty. The government has stated that it anticipates that Caine will testify that, as regards the 1985 charges, he entered into a scheme with Chanes to market products through false and misleading advertisements. The government alleges that Caine will further testify that

Chanes secured the services of an attorney to approve the advertisements and advised Caine that having an attorney review and approve the advertisements would protect them from prosecution in the future. (Govt. Letter Sept. 13, 2004 at 2.) Since the defendants both entered pleas, this defense of reliance on advice of counsel was never actually proffered in that case.

From April 1985—July 1989, subsequent to Chanes' conviction in the Southern District case, Weil Gotshal also provided legal services to companies in which Norman Chanes had an ownership interest. (Jaffe Aff. at 1.) Helene Jaffe and other members of the firm reviewed and approved advertisements for the companies. In 1989, Chanes was introduced to Joel R. Dichter, an attorney at Klein, Zelman, Rothermel & Dichter, LLP ("Klein Zelman"), by Steve Becker, a partner of Chanes's in at least one company. Dichter, who had been providing legal services to Mr. Becker and to the companies in which he had an ownership interest, then began providing legal services to Chanes and his companies, shortly after Chanes terminated his relationship with Weil Gotshal. It was also during this same time period that Mr. Dichter met Chanes' codefendant Richard Martino, who worked or came to work with Chanes and Becker on various audiotext projects.[5]

Between 1990—1995, Klein Zelman provided legal services to companies in which Chanes and/or Martino either had an ownership interest or with which their companies were conducting business. (Weil Gotshal Mem. Aug. 11, 2004 at 8.) The legal advice provided concerned the audiotext industry, including regulatory compliance with FCC and FTC rules. Beginning in 1995, Klein Zelman began providing legal advice on Internet use and Internet-related advertising. *Id.*

The government alleges that both Mr. Wing's representation of Caine, and Ms. Jaffe's prior representation of Chanes constitute grounds for disqualification of Mr. Wing as counsel for Norman Chanes, because the government intends to call both Ms. Jaffe and Mr. Caine as witnesses to rebut any reliance on counsel defense advanced by Chanes.

## II. Discussion

■■■ The Supreme Court, in *Wheat v. United States,* recognized the difficulties facing a district court judge when ruling on a disqualification issue:

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.

486 U.S. 153, 162–63, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). In considering motions to disqualify trial counsel, district judges must balance the competing policies of a defendant's Sixth Amendment right to counsel and the need to preserve the highest level of professional responsibility. *United States v. Cunningham,* 672 F.2d 1064, 1070 (2d Cir.1982). The Sixth Amendment of the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." The purpose of the Sixth Amendment is

---

**5.** The government alleges that Chanes met Martino prior to ending his relationship with Weil Gotshal and hiring Mr. Dichter.

Chanes's papers are unclear about the timing. (Weil Gotshal Mem. Aug. 11, 2004 at 7; Govt. Motion July 29, 2004 at 5.)

"simply to ensure that criminal defendants receive a fair trial," *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and therefore focuses on guaranteeing an effective advocate for each criminal defendant, rather than ensuring that the defendant is represented by the counsel he prefers. *Wheat*, 486 U.S. at 159, 108 S.Ct. 1692. The Second Circuit has nevertheless consistently recognized that "the right of a defendant who retains counsel to be represented by that counsel, 'is a right of constitutional dimension'" and therefore, that the "[c]hoice of counsel should not be unnecessarily obstructed by the court." *Cunningham* at 1070 (citations omitted). However, it is equally well settled that the Sixth Amendment right to counsel is not absolute, and while it does create a presumption in favor of the defendant's counsel of choice, it may be overcome by a demonstration of a serious potential for conflict. *Wheat*, 486 U.S. at 165, 108 S.Ct. 1692 ("[T]he district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses."). This is because "federal courts have an independent interest in ensuring that criminal trials are conducted within ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat* at 160, 108 S.Ct. 1692.

### III. Disqualification based on the Advocate–Witness Rule

As a preliminary matter, it should be noted that the entire question of disqualification based on the advocate-witness rule would be moot, should Chanes not raise a reliance on counsel defense—in such a case, the government would have no other legitimate grounds upon which to question

Ms. Jaffe. Here, Chanes' counsel has indicated that Chanes will likely raise such a defense, which will encompass the claim that Chanes had no intent to mislead consumers in his advertisements since they had been reviewed by counsel for compliance with, among other regulations, the Federal Trade Commission's clear and conspicuous disclosure standard.

### A. Waiver of the Attorney–Client Privilege

Prior to addressing the larger question of whether disqualification is necessary in the present case, this Court must first answer the threshold question of whether the attorney-client privilege adhering to Chanes' communications with Ms. Jaffe during the time period between April 1985 and July 1989, when Weil Gotshal represented his companies, would likely be waived in the event that Chanes asserts a reliance of counsel defense. Obviously, if no circumstances could be envisioned in which the privilege would be waived, the disqualification issue would not arise. As this question focuses on legal advice regarding the Federal Trade Commission's disclosure requirements, and the application of those requirements to different advertising media, it is necessary to have an understanding of the provisions in question. It is therefore helpful, as a preliminary matter, to examine these provisions, insofar as they relate to the advice received by Chanes.

The Federal Trade Commission Act of 1914, 15 U.S.C. §§ 41–58 (2004) prohibits unfair or deceptive advertising in any medium, including internet advertising. Section 5(a) of the Act prohibits "unfair or deceptive acts or practices in or affecting commerce" and provides the Commission with the requisite powers to prevent such acts or practices. 15 U.S.C. §§ 45(a)(1) & (2). Section 12 of the Act focuses on false

advertisements in particular and prohibits "any false advertisement" that is likely to induce the purchase of "food, drugs, devices, services, or cosmetics." 15 U.S.C. § 52(a)(2). False Advertisements are defined, in § 15 of the Act, as advertisements that are "misleading in a material respect." 15 U.S.C. § 55(a)(1). The FTC has attempted to provide some guidance regarding the legal standards which it applies in Section 12 cases and in October 1983, it issued the FTC Policy Statement on Deception, in which it sought to "provide guidance to the public" regarding the "Commission's enforcement policy against deceptive ads or practices." Federal Trade Commission, *FTC Policy Statement on Deception*, October 14, 1983, *at* http://www.ftc.gov/bcp/policystmt/ad-decept.htm [hereinafter FTC Policy Statement]. The FTC laid out a three-part test for determining whether an advertisement is misleading: (1) there must be a representation, omission, or practice that is likely to mislead the consumer; (2) it must be likely to mislead consumers acting reasonably under the circumstances; and (3) it must be material. *Id.; In re Cliffdale Associates, Inc.,* 103 F.T.C. 110 (1984) (applying the policy statement guidelines). In an FTC publication directed at explaining this standard to businesses, the FTC explained that these consumer protection laws apply to advertisements in all media. Federal Trade Commission, *Facts for Businesses: Dot Com Disclosures,* available *at* http://www.ftc.gov/bcp/conline/pubs/buspubs/dotcom/index.pdf [hereinafter Dot Com Disclosures] ("The same consumer protection laws that apply to commercial activities in other media apply online. The FTC Act's prohibition on 'unfair or deceptive acts or practices' encompasses Internet advertising, marketing, and sales."). Adequate disclosure, however, can prevent an advertisement from being deceptive, provided that it is "clear and conspicuous." Dot Com Disclosures ("Disclosures that are required to prevent an ad from being misleading, to ensure that consumers receive material information about the terms of a transaction or to further public policy goals, must be clear and conspicuous."); *FTC v. Five Star Auto Club, Inc.,* 2000 WL 1609798 (S.D.N.Y. June 12, 2000); *In re Palm Inc.,* 2002 WL 663657 (F.T.C. Apr.17, 2002). The FTC takes several factors into account in assessing whether a given disclosure meets the standard, namely the placement of the disclosure in an advertisement and its proximity to the claim it is qualifying; the prominence of the disclosures; whether items in other parts of the advertisement distract attention from the disclosure, whether the advertisement is so lengthy that the disclosure needs to be repeated; whether disclosures in audio messages are presented in adequate volume and cadence and visual disclosures appear for a sufficient duration; and whether the language of the disclosure is understandable to the intended audience. Dot Com Disclosures. Although it is true that these factors differ somewhat based on the medium being used, they can be applied to any medium. For example, whereas the proximity of a disclosure in a print ad can be measured by the actual proximity of the disclosure to the claim, the internet is somewhat more complex due to the interactive nature of web pages and the possibility of clicking on additional links or triggering pop-up screens; nevertheless, the principal requirement that the claim and the disclosure be placed in proximity to one another is still applicable.

■ This issue before the Court at this juncture is whether Chanes' assertion of a reliance on counsel defense, stating that he relied on Mr. Dichter's assertions that his advertisements complied with the FTC disclosure standards outlined above, would waive Chanes' privilege not only as to com-

munications with Mr. Dichter with regard to the advertisements at issue in this case, but also as to communications with Ms. Jaffe regarding the compliance of a previous set of advertisements to which the same FTC standard applied.

 The fundamental purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.1991) (citations omitted). Although the attorney-client privilege offers time honored protection to such communications, "the privilege takes flight if the relation is abused." *Id.* (quoting *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933)); *United States v. Weissman*, 1996 WL 737042 at *29 (S.D.N.Y. Dec.26, 1996) ("[S]ince the purpose of the attorney-client privilege is to protect the confidentiality of attorney-client communications in order to foster candor within the attorney-client relationship, voluntary breach of confidence or selective disclosure for tactical purposes waives the privilege. Disclosure is inconsistent with confidentiality, and courts need not permit hide-and-seek manipulation of confidences in order to foster candor."). Consequently, courts have repeatedly concluded that, where a party places matters which would be covered by the attorney-client privilege at issue, such as by asserting a reliance on counsel defense, the attorney-client privilege will be waived in order to prevent the privilege from being used for the purpose of prejudicing an opponent's case by providing only selective disclosure. *Bilzerian* at 1292; *Brock Equities Ltd. v. Josephthal, Lyon, & Ross, Inc.,* 1993 WL 350026 at *1 (S.D.N.Y. Sept. 16, 1993) ("A party can only waive the attorney-client privilege as to certain subjects as a whole, and may not select only certain testimony or documents to produce while leaving other evidence shrouded in privilege."); *In re Consol. Li-*

*tig. Concerning Int'l Harvester's Disposition of Wisconsin Steel,* 1987 WL 20408 at *3 (N.D.Ill. Nov.29, 1987) ("Selective disclosures waive a privilege as a matter of fairness to the adverse party."). In other words, the privilege may not simultaneously be used as a shield and a sword; where a defendant opens the door by waiving the attorney-client privilege, as would be the case if Chanes were to assert a reliance on counsel defense, the defendant can not open the door only to the information he would like to admit. *Bilzerian,* 926 F.2d at 1292.

Although this principle of waiver is well-settled, the more difficult question is the scope of such a waiver. Chanes argues that the waiver here should be limited to the legal standard—here the FTC disclosure standard—as applied to the facts and circumstances under which the legal advice was rendered. Therefore, the argument goes, Chanes' privilege should only be waived as to Dichter's communications regarding the application of the FTC standards to the audiotext and internet advertisements at issue in this case, rather than as regards advice that Chanes received on the "clear and conspicuous disclosure" standard more broadly. Noting that Ms. Jaffe's advice related to mail order advertisements, and not the internet and audiotext advertisements at issue in this case, Chanes argues that the subject matter of the waiver does not extend to his communications with Jaffe. (Weil Gotshal Mem. Aug. 11, 2004 at 34.)

The government, on the other hand, maintains that any advice received by Chanes regarding the FTC's disclosure standard is relevant to determining his good faith reliance on Mr. Dichter's advice, and that Chanes has waived the privilege with respect to all communications that his assertion has logically placed "in issue." (Govt. letter July 29, 2004 at 9, citing

*Bilzerian.*) Relying on the Modern Federal Jury Instructions, the government argues that if Chanes were to assert a reliance on counsel defense, the jury would be required to determine whether Chanes "honestly and in good faith sought [Dichter's] advice [and] in good faith ... honestly followed such advice, relying upon it and believing it to be correct." (Govt. Letter Sept. 9, 2004 at 2.) In order to do this, the government argues, the jury must be apprised of all information and advice that Chanes received regarding what constitutes adequate disclosure, including the advice from Ms. Jaffe and her application of the standard to his previous advertisements.

The argument that the jury should be able to assess the totality of Chanes' knowledge, including any advice he received on the matter from prior counsel, finds support in the case law of this Circuit. In *Bilzerian,* the defendant, who was charged with having violated federal security laws, sought to testify that he had lacked the intent to violate the laws without waiving communications with his attorney on the subject. The district court denied the defendant's motion, holding that if the defendant testified that his actions were in good faith, such testimony would open the door to cross-examination with respect to the basis for this belief, including communications with his attorney. The Second Circuit upheld the district court's determination and engaged in a lengthy discussion of the attorney client privilege and its waiver. In particular, in discussing why waiver was applicable, the court stated that:

> This waiver principle is applicable here for Bilzerian's testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue. His conversations with counsel regarding the legality of his schemes would have been directly rele-

vant in determining the extent of his knowledge and, as a result, his intent. 926 F.2d at 1292; *United States v. Exxon Corp.,* 94 F.R.D. 246, 248–49 (D.D.C.1981) ("These defenses [of good faith reliance] do not solely relate to the 'objective' representations of DOE but directly concern Exxon's subjective interpretation and understanding of those representations; i.e. Exxon's corporate state of mind"); *Oxyn Telecomm., Inc. v. Onse Telecom,* 2003 WL 660848 at *6 (S.D.N.Y. Feb.27, 2003) ("If a defendant asserts his reliance on advice of counsel, or asserts good faith in either a claim or a defense, the basis of his knowledge, including legal advice from counsel, will be subject to disclosure."). Although it is true that the court in *Bilzerian* was addressing the question of whether waiver itself was proper, rather than the scope of the waiver, the court's reasoning in deciding to find the privilege waived was that Bilzerian had placed his reliance in issue and that by doing so, he waived the privilege as to all communications directly relevant to a determination of his good faith assertion of a reliance defense. This focus on the state of mind of the defendant in determining whether the privilege has been waived is not unique to *Bilzerian.* In *In re Gaming Lottery Securities Litigation,* 2000 WL 340897 (S.D.N.Y. Mar.30, 2000), defendants alleged that they had relied on the advice of counsel in their belief that they were able to acquire and operate a manufacturer of gaming devices without first obtaining a license to operate these gambling-related enterprises in the states in which they did business. The court held that by raising the defense of reliance on counsel, defendants also raised the issue of "reasonableness of [their] state of mind in relying on legal advice from counsel for the seller that it was safe to proceed with the transaction." The court held that, "the legal advice they received from any other lawyers on that subject

relates to the reasonableness of defendants' reliance and is not subject to the attorney/client privilege," essentially because these communications were relevant to their state of mind in proceeding to acquire and operate the company. *In re Gaming* at *2.[6]

Moreover, in *Convolve, Inc. v. Compaq Computer Corp.*, 224 F.R.D. 98, 2004 WL 1178783 (S.D.N.Y. May 28, 2004), the court analyzed a similar question in the context of a patent infringement lawsuit, namely whether the waiver of the attorney-client privilege as to the legal advice of opinion counsel also extends to communications with trial counsel which occurred thereafter. The court, citing *Akeva L.L.C. v. Mizuno Corp.*, 243 F.Supp.2d 418, 423 (M.D.N.C.2003), held that the waiver resulting from a party's assertion of the advice of counsel defense to a claim of willful patent infringement "extends not only to the attorney who rendered the opinion creating the waiver, but also to all other attorneys who may have advised or communicated with the client on the same subject matter." This is because, "[t]he infringer may not pick and choose between what opinions will be relied upon and which will be discarded. The totality of the circumstances test requires that all knowledge gained by the infringer relating to the advice subject matter must be revealed so that the factfinder can make its own determination as to whether the reliance was reasonable." *Akeva,* 243 F.Supp.2d at 423.

Chanes, however, argues that these cases do not support an extension of the waiver to communications with Ms. Jaffe

because the waivers in these cases never extended to a larger legal principle but were limited to the communications regarding the particular subject matter at issue in that case, such as the specific transaction or the specific patent. His assessment of the factual circumstances is correct. On the other hand, no case appears to have addressed a factual scenario similar to his case and concluded that the waiver would not be extended to earlier on discussions on the same legal issue. Because the facts of this case present a novel issue which has not been directly addressed in the available case law, the Court must look to the principles underlying the attorney client privilege, the reasons for which it is waived where a reliance on counsel defense is asserted, and the considerations and approaches taken by courts in addressing these issues. The issue becomes largely one of relevance. As indicated above, courts have repeatedly indicated that the waiver will not protect communications that shed light on whether reliance on counsel would have been reasonable and in good faith.

Given the applicability of the same FTC disclosure standard to all advertisement mediums, the extent to which a party is aware of the rules of disclosure, and of the factors which are taken into consideration in the application of those rules to a particular medium, is relevant to a determination of whether that same party relied in good faith on the advice of counsel when applying the same principles to a different medium.[7] In other words, if Chanes received information from Ms. Jaffe regarding the application of the FTC standards

---

6. The Court agreed to review certain notes in camera to determine if they bore on the issue.

7. This is also suggested by the notion that in assessing reasonableness of reliance on counsel's determination that a patent is invalid, "[r]easonableness is not analyzed without taking into account the circumstances of the

client—the more sophisticated the client, the more stringent the duty of inquiry on the party of the client." Chanes' experience in having dealt with the FTC standards for years and with different attorneys would appear to be relevant to determining his good faith reliance on advice he received regarding adequate disclosure.

to advertisements, even if in a different medium, this information would relate to his knowledge of what constitutes adequate disclosure and the likelihood that the disclosures in his internet and audiotext advertisements met the FTC standard. In particular, as the government pointed out in its letter to the Court dated September 7, 2004, if Ms. Jaffe ever advised Chanes regarding the manner in which price terms must be disclosed under the FTC standards, or the use of terminology regarding whether a consumer would or would not be charged for his or her use of a product or service, this would be highly relevant, regardless of the medium to which the advice related. Limiting the waiver to include only the advice received from Mr. Dichter would undermine the principles underlying the waiver of the privilege when there is a reliance of counsel defense, namely that selective disclosure is not permitted. There is no reason why Chanes should be able to use the attorney-client privilege to withhold information relevant to his knowledge and good faith reliance, when it is he who puts that good faith and knowledge into issue.

For these reasons, this Court finds that if Chanes were to assert a reliance on counsel defense, doing so would waive his attorney client privilege not only as to his conversations with Mr. Dichter, but as to his conversations with Ms. Jaffee relating to the application of the FTC disclosure standards.

### B. Disqualification under the Witness–Advocate Rule

■ Because the attorney-client privilege has been deemed waived as to Chanes' communications with Ms. Jaffe on the issue of the applicability of the FTA "clear and conspicuous disclosure" standard, this Court is now faced with the question of whether Weil Gotshal should be precluded from defending Chanes as a result.

■ In determinating when disqualification of counsel is required under the advocate-witness rule, the Second Circuit is guided, although not bound, by the New York Code of Professional Responsibility, which states, in Disciplinary Rule 5–102(d), that:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or a lawyer in his or her firm may be called as a witness on a significant issue other than on behalf of the client, the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client at which point the lawyer and the firm must withdraw acting as an advocate before the tribunal.

N.Y. Comp.Codes. R. & Regs. tit. 22 § 1200.21(d) (2004); *Renner v. Townsend Fin. Servs. Corp.*, 2002 WL 1013234 at *6 (S.D.N.Y. May 20, 2002); *Paramount Communications Inc. v. Donaghy*, 858 F.Supp. 391, 394 (S.D.N.Y.1994); *United States v. Wallert*, 733 F.Supp. 570, 572 (E.D.N.Y.1990). However, courts have made clear that motions to disqualify counsel, in particular motions under the advocate-witness rule, are viewed with disfavor because of their interference with a defendant's right to choose his own counsel and their "strong potential for abuse." *Paramount* at 394 (courts require party seeking disqualification to meet a "high standard of proof" before disqualification may be granted); *United States v. Tate & Lyle N. Am. Sugars, Inc.*, 184 F. Supp 2d 344, 346 (S.D.N.Y.2002); *Fulfree v. Manchester*, 945 F.Supp. 768, 770 (S.D.N.Y.1996) ("[M]otions to disqualify opposing counsel are viewed with disfavor because they impinge on parties' rights to employ the counsel of their choice."); *Russo v. Friedman*, 1992 WL 196791 at * 9 (S.D.N.Y. July 31, 1992) (calling for "particularly strict scrutiny"); *Lamborn v. Dittmer*, 873

F.2d 522, 531 (2d. Cir.1989) (Motions to disqualify counsel are subject to "fairly strict scrutiny, particularly motions under subdivision (B)," because "the courts must guard against tactical use" of such motions).

In order to succeed on a motion seeking disqualification, the moving party must demonstrate the necessity of the testimony as well as a substantial likelihood of prejudice to the defendant. *Parkins v. St. John*, 2004 WL 1620897 at *6 (S.D.N.Y. July 19, 2004) (quoting *Parke–Hayden, Inc.*, 794 F.Supp. at 527). Necessity is determined by consideration of factors such as "the significance of the matters, the weight of the testimony, and the availability of other evidence;" *Paramount*, 858 F.Supp. at 394; *Sec. Ins. Co. of Hartford v. Mendon Leasing Corp.*, 2002 WL 31387484 at *2 (S.D.N.Y. Oct.22, 2002).

Prejudice, on the other hand, requires that the testimony be "sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony." *Parke–Hayden, Inc. v. Loews Theatre Mgmt. Corp.*, 794 F.Supp. 525, 527 (S.D.N.Y.1992) (quoting *Rice v. Baron*, 456 F.Supp. 1361, 1371 (S.D.N.Y.1978)); *Parkins* at *6; *Paramount*, 858 F.Supp at 395; *Lamborn*, 873 F.2d at 531 (citations omitted); *Wallert*, 733 F.Supp. at 573. Moreover, in proving prejudice, the moving party "bears the burden of demonstrating how and as to what issues in the case prejudice may occur and that the likelihood of prejudice occurring is substantial." *Id.*

The standards governing whether or not to disqualify counsel are clear; the difficulty lies not in identifying them, but rather in their application, which requires a fact-intensive inquiry. *Renner*, 2002 WL 1013234 at *7. The government argues that Ms. Jaffe's testimony is necessary to establish the full extent of Chanes' knowledge of the FTC disclosure standards, and that her testimony will be highly prejudicial to Chanes, in that it will serve to rebut his affirmative defense. Although it is true that the government does not know exactly what Ms. Jaffe will say if called as a witness, the government has made a sufficient showing that her testimony meets the necessary criteria.

It appears to a near certainty that Norman Chanes will defend against these charges on the grounds that he was told that the advertisements the government claims are false and misleading in fact complied with the law. This advice was provided by Joel Dichter. The government wishes to challenge this reliance on counsel defense by calling as a witness Helen Jaffe. It argues that Ms. Jaffe's anticipated testimony will undermine that defense. Although it does not know what her precise testimony will be, it has pieced together certain information. First, she began to represent him after his 1985 plea and conviction for mail fraud; she represented him in connection with his business pertaining to advertisements for various products; she is a leading trade-practices lawyer and a specialist in FTC marketing regulation; and although her affidavit filed with the Court denied giving advice in certain areas, it did not deny that she provided advice as to the Federal Trade Commissions "clear and conspicuous disclosure" standard. It is thus more than reasonable to conclude that she would of necessity had to have advised him about, if not the requirements of the FTC standard per se, then, at the very least, the application of those principles to the advertisements she discussed with him. The government's argument is that Dichter's advice was plainly wrong,[8] and that Ms.

8. In support of its claim that these advertise-

ments were obviously deceptive, the govern-

Jaffe, a competent lawyer, would never have provided such advice, a fact which the government argues Chanes knew based upon the advice that she had given him in the past. The government goes even further in its analysis to argue that Chanes purposely abandoned Ms. Jaffe, a competent and ethical attorney, and went to the more accommodating Mr. Dichter when he decided to once again embark on fraudulent schemes. In seeking to advance this argument, the government attempts to disparage Mr. Dichter's competence, work habits, and record keeping, while contrasting it to Ms. Jaffe's. More recently, the government has lent greater credibility to the claim that Chanes selected a lawyer to cover the fraud by proffering as a witness Mr. Caine, Chanes' codefendant in the 1985 fraud. According to Caine, he and Chanes were marketing products through advertisements that were materially false and misleading and Chanes told him that they would not be prosecuted because the advertisements had been reviewed by a lawyer. (Govt. Letter Sept. 13, 2004 at 2.)

It is not possible to assess at this point the ultimate persuasiveness of the government's theory that Chanes left Jaffe and hired Dichter specifically to engage in fraud. Chanes has presented information which would undercut the strength of some of the government's inferences but not eliminate them. It does not appear to this Court, however, to be a frivolous or unsupported theory. In any event, whether the government establishes this theory

or not, it is quite likely that Ms. Jaffe will have relevant testimony to give that will go directly to the issue of Chanes' knowledge and state of mind as it pertains to his reliance on counsel defense.

A review of the factors that contribute to a finding of necessity—the significance and weight of the evidence, as well as the availability of other evidence—weighs in the government's favor. This testimony meets the necessity criteria since Ms. Jaffe is the only other identified lawyer who provided Chanes with advice in this area and the one who directly preceded Dichter. Chanes misses the point when he says that Dichter is available to offer testimony regarding the extent of Chanes' knowledge of the FTC standard, and thus Ms. Jaffe is not needed. The crux of the government's argument is that it needs to demonstrate what "other" lawyers informed him about, not the one Chanes will proffer that he relied on. This is particularly true where the government seeks to prove by inference that he purposely left the competent Jaffe to engage the less competent but more agreeable Dichter.

With regard to the prejudice element, it is clear that if Ms. Jaffe testifies as expected by the government or in any way provides information that would undermine Chanes' assertion of good faith reliance on Mr. Dichter, such testimony would be highly prejudicial and Chanes would certainly have an interest in having that testimony discredited by an unconflicted lawyer. An effective cross-examination of Ms.

ment points to the decision of the Honorable Lewis A. Kaplan in *FTC v. Crescent Publishing Group*, 129 F.Supp.2d 311, 321 (S.D.N.Y. 2001), a case involving the same adult entertainment websites alleged to have been fraudulent in the internet scheme in this case. Judge Kaplan granted a preliminary injunction in connection with operation of the websites, finding that, "Defendants appear to have done their level best ... to lead users to

believe that their credit cards would not be charged for exploring these websites.... Although at least some of the web pages mentioned price information ... the information appeared against a backdrop of sexually explicit images, was relatively inconspicuous, and in any case did not make sufficiently clear that one further step would result in the imposition of charges against the user's credit card."

Jaffe might include challenging her competency and credentials in the area of trade practices; the quality of her—and by definition, Weil Gotshal's—prior representation of Chanes. As a partner of the same firm, Mr. Wing certainly has an interest in maintaining the reputation of his firm; a cross examination in which a goal will be to undermine the government's contention that his firm provided "ethical, quality legal advice, at a reasonable rate," could certainly present a conflict of interest for Mr. Wing. See *United States v. Schlesinger*, 335 F.Supp.2d 379, 384 (E.D.N.Y.2004) (discussing conflict of interest arising where lawyer is potential witness and has personal interest in protecting reputation of his firm).

Moreover, although it is true that the government can not prove just what Ms. Jaffe will testify to, the government must only demonstrate a substantial likelihood of prejudice. *Renner*, 2002 WL 1013234 at * 7, quoting *Bristol–Myers*, 2000 WL 1006235 at *2 ("where there is a substantial likelihood that the lawyer's testimony is or may be prejudicial to his client, disqualification of a lawyer and his firm is required."). Moreover, to the extent that there is any doubt, courts in this district have held that "doubts should be resolved in favor of disqualification." *Amalgamated Serv. and Allied Ind. Joint Bd. v. Supreme Hand Laundry*, 1996 WL 583351 at *3 (S.D.N.Y. Oct.9, 1996); *Renner*, 2002 WL 1013234 at *7.[9]

As a final matter, this Court is firmly persuaded that the concern raised by a disqualification motion under the advocate-witness rule, namely that the party seeking disqualification is "manufacturing a conflict in order to prevent a defendant from having a particularly able defense counsel at its side," *Wheat*, 108 S.Ct. at 1692, is not a valid concern here. Finally, given the nature of the conflict in this case, waiver is inappropriate. A conflict in which the interests of an attorney and his client conflict, such as where an attorney will be testifying against his client, can not be waived, as even waiver would not ensure that the trial could be "conducted within the ethical standards of the profession." *Wheat*, 108 S.Ct. at 1697; *United States v. Schlesinger*, 335 F.Supp.2d 379, 384 (Finding conflict unwaivable where attorney might be called as witness and would have personal interest in protecting his and his firm's reputation); *U.S. v. Joyeros*, 2001 WL 1597803 at * 2 (E.D.N.Y. Oct.19, 2001); *Wallert*, 733 F.Supp. 570 at 573–74. Both the government and Chanes appear to acknowledge this fact, as neither has even argued that waiver would be a possibility in the event of a finding of a conflict of interest.

## II. Disqualification because of Mr. Wing's prior representation of government witness

The government's motion to disqualify Weil Gotshal based on Mr. Wing's prior representation of Mr. Caine, Chanes' former co-defendant whom the government plans on calling as a witness at trial, also raises important concerns regarding Chanes' right to unconflicted counsel. The conflict arises because, as stated over 50 years ago by Judge Weinfeld:

---

9. The Court also envisions another way in which Ms. Jaffe's testimony might be necessary and which would create a different but equally problematic concern. Were Chanes to testify and were the government to cross-examine him on its theory that he abandoned Jaffe to go with Dichter, the possibility exists that Jaffe would have favorable testimony which might dispel that theory. John Wing, her partner, could be said to have an interest in her not being called either to avoid disqualification of the firm and consequent lack of fees or to avoid having one of the members of the firm cross-examined by the government in a way that might harm the firm's reputation.

A lawyer's duty of absolute loyalty to his client's interests does not end with his retainer. He is enjoined for all time, except as he may be released by law, from disclosing matters revealed to him by reason of the confidential relationship. Related to this principle is the rule that where any substantial relationship can be shown between the subject matter of a former representation and that of a subsequent adverse representation, the latter will be prohibited.

*T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265, 268 (S.D.N.Y.1953). In this case, the conflict would arise from the fact that Mr. Wing continues to owe a duty of loyalty to Mr. Caine, and this duty of loyalty could interfere with Mr. Wing's ability to cross-examine him effectively. Although it is likely that this conflict, standing alone, would not serve as grounds for disqualification—given Chanes' willingness to waive any conflict of interest and to accept limitation of Mr. Caines' cross-examination to non-privileged matters— taken in conjunction with the additional conflict of interest discussed in detail above, it further supports this Court's decision to disqualify Weil Gotshal as counsel for Chanes. *United States v. Levy,* 25 F.3d 146, 157 (2d Cir.1994) ("Even if we could overlook any one ground of conflict, the myriad connections ... oblige us to consider [counsel]'s conflicts together."); *United States v. Rahman,* 861 F.Supp. 266 (S.D.N.Y.1994) ("[I]n a case in which there are myriad conflicts, each cannot be considered in isolation, but rather must be considered together when assessing whether there is a congruence of interests between the lawyer and his client.").

### III. The Independent Counsel Alternative

 When the conflict with Ms. Jaffe was first brought to this Court's attention, the Court inquired whether retaining separate counsel to cross-examine Ms. Jaffee would provide an adequate alternative to disqualification. In its letters to the Court, Chanes has now argued in favor of this notion and has proposed that having Chanes retain independent counsel for the cross-examination of both Ms. Jaffe and Mr. Caine would provide a viable alternative to disqualification. However, after having given the matter more serious consideration, the Court is not convinced that the use of an independent counsel would suffice to eliminate the conflicts in their entirety. The specter of Ms. Jaffe as a potential witness and the impact of her testimony will extend beyond her mere cross-examination; it will permeate the entire trial, including the opening statement, summation, and advice to Chanes as to whether or not he should testify. On reflection, this Court concludes that, despite its fervent hope that this alternative would resolve this extremely difficult and troubling problem, retaining separate counsel to cross-examine Ms. Jaffe will not suffice. The conflict cannot be so neatly compartmentalized. Moreover, as pointed out by the government, the cases cited by Chanes, in which retention of independent counsel to handle a portion of the case resolved the conflict, did not involve advocate-witness conflicts. The fact that this case not only presents an unwaivable conflict of interest under the advocate witness rule, but also presents a potential conflict due to Mr. Wing's prior representation of a second likely government witness highlights the need to err on the side of caution and to disqualify Weil Gotshal from serving as trial counsel to defendant Chanes.

In a recent decision of the Second Circuit, *United States v. Jones,* 381 F.3d 114, 121 (2d Cir.2004), the court upheld the district court's decision to disqualify defendant's counsel and stated that "[t]he risk that [defense counsel] would become a witness at trial was enough alone to allow the district court to reach this determination

**558**

under an abuse of discretion standard." *Jones,* 381 F.3d at 121. In reaching its conclusion, the court again recognized the predicament in which district courts find themselves, stating that:

> [I]n situations where a potential conflict exists, one that may ripen into an actual conflict as the trial progresses, district courts must have wide latitude to permit or deny a defendant's waiver of such conflict. We recognize that a trial court confronted with waiver issues is faced with an unenviable choice—no matter which way it rules—of being reversed on appeal. Hence, the trial judge is caught in a daunting dilemma between what appears to be two choices, both of which are potentially negative from its standpoint.

*Jones,* 381 F.3d at 121 (citing *Wheat*). Faced with exactly this predicament, this Court finds that the manner in which best to discharge its primary obligation of ensuring the integrity of the judicial process in this case, given the potential conflicts which have arisen, is to disqualify Weil Gotshal from serving as defendant's counsel.

### *CONCLUSION*

Therefore, for the reasons set forth above, the severance motions of defendants Schaeffer, Nadell, and Levy pursuant to Rule 14 of the Federal Rules of Criminal Procedure are granted. All other severance motions are denied. The government's motion to disqualify Weil, Gotshal & Manges as counsel for defendant Chanes is granted.

SO ORDERED.